*Murray* vs. *Fox, et al.*

## MURRAY vs. FOX, ET AL.

A, living in the State of Tennessee, and being indebted to B, conveyed certain slaves in payment of the debt: A being at the time otherwise free from debt. On the same day by a voluntary conveyance, duly executed according to the laws of Tennessee, B conveys the slaves to C in trust for the wife of A and her children. A then moves to this State with his family, bringing with him the slaves, and continuing to exercise acts of ownership over them, his wife passively submitting to his assumed ownership. After some years residence in this State, A becomes involved in debts, and his creditors levy on and sell the slaves as his property; the wife at the time of the levy and sale proclaiming her title. *Held:*

1. So far as A's creditors are concerned, it is immaterial, whether B at the time of his conveyance to C was insolvent, or designed to practice a fraud.

2. That by the deed the title was vested in C for the benefit of A's wife and children, and the passive submission of the wife, and the assumed ownership of A, do not affect her title.

3. The title being vested in C by the deed properly executed, the removal to this State, and failure to record the deed here, does not affect the rights of the wife.

## APPEAL from Monroe Circuit Court (In Chancery.)

TODD & GLOVER, *for Appellants.*

1st. The deed of trust from Binns to Turner, for use of sister and children, for slaves and personal estate, duly registered in Tennessee, where made, is a valid deed. See laws of Tennessee, "Slaves" and "Registry."

2nd. Such deed, if impeached for fraud on part of Binns, against creditors, must be attacked by the creditors of Binns.

3rd. If the title of Binns was derived from Samuel Murray, the husband of the wife and children, and fraud is imputed against him as to creditors, it must be shewn there were such creditors.

4th. If there were such creditors, and the deed was made to Binns on valuable consideration and bona fide, it passes a good title.

5th. If there were such creditors, and the intent of the grantor was to defraud them, and the grantee was ignorant thereof, and gave a valuable consideration, the title is valid.

6th. It is incumbent on subsequent creditors of Murray to prove affirmatively his indebtedness at the time of making the deed to Binns, and an intent in the minds of both parties to the deed to defraud them; or in case there was no valuable consideration passing between them, they must prove a positive fraudulent intention in Murray to cover and secure the property against debts he intended to make.

7th. No declarations of Murray or Binns, made subsequent to the respective times of executing the deeds, can invalidate the appellant's title.

8th. The possession of the husband, of the property in question, its removal to this State, the subsequent possession here, and the use or sale of any part thereof, with her consent, cannot affect her title, or constitute evidence of fraud—the possession of the husband being the possession of the wife in law, in such cases. Allison vs. Bowles, 8 Mo. Rep. 348; Forsythe vs. Kregbaum, 7 Mon., 97; Kenningham vs. McLaughlin, 3 Mon. 31; Orr vs. Pricket, 3 J. J. Marshall, 280.

9th. The declarations a party (Murray,) vendor subsequent to a sale or transfer of the property, are not admissible in evidence. 3 Bibb, 9; 3 Litt. 14; 4 Bibb, 290.

10th. Such declarations, *even of a party*, in presence of the witness only, ought to be weighed with great caution—it is the most dangerous species of evidence held competent by law. 1 Bibb, 611; 4 Litt. 186; 6 Mon. 136.

11th. Little weight should be given to light and fugitive remarks in relation to a persons contracts or transactions of any kind—the proof of them should be cautiously weighed—it should be clear and satisfactory. 1 Mars. 465.

12th. Where there are reasonable motives for a party's silence, his not having replied to a conversation had in his presence, shall not be taken as evidence of its truth. Litt. 6, 145.

13th. Confessions ought not to be received at all, except against the party making them, or those claiming under him, and then *statements* made by a person, after parting with his title, are not to be admitted. 2 J. J. Mars. 64; 2 Mars. 225; 1 Mars. 237; Hardin, 549; 1 Bibb, 611; 4 Litt. 186; 6 Mon. 136; 4 Mon. 239.

14th. Facts will not be permitted to be given in evidence, in prejudice to a *feme covert's* rights, from which *in law*, inferences are to be drawn to prejudice them, even after she is discovert. 3 Dana, on page 299.

15th. Admissions presumed from silence are no evidence, when the person is ignorant of the facts. 1 Greenleaf, 199, secs. 200, 201; and very unsatisfactory in general, if verbal.

## WELLS, *for Appellees.*

The bill was properly dismissed by the Circuit Court, on the ground that the conveyances above referred to were fraudulent in fact, and if so, are void as to all creditors prior and subsequent. 1 Dana, 531.

The conveyances having been made to defraud creditors, are void as to subsequent as well as prior creditors.

*Murray* vs. *Fox, et al.*

McBRIDE, J., *delivered the opinion of the Court.*

Mary Ann Murray, by her next friend, Richard R. Lee, instituted her suit in chancery, by bill, against the defendants, James C. Fox and others, in the Monroe Circuit Court, to regain the possession of certain slaves therein mentioned, which she claims by virtue of a trust deed executed by her brother, William A. Binns, to Robert Turner, in trust for the use of her and her children. The bill was dismissed upon the hearing in the circuit court, and a decree entered against her for costs; thereupon she excepted and appealed to this Court.

The bill alledges that, for several years prior to 1837, the complainant was and still is the wife of Samuel Murray, one of the defendants, living and cohabiting with him as such, and on the 4th September of said year they resided in the county of Davidson and State of Tennessee, when, through misfortune and bad management, they were reduced to very humble, though solvent circumstances, with a family of eight children. To aid her in the support and education of her children, her brother, William A. Binns, also a resident of the same county and State, executed a deed conveying to Robert Turner certain slaves and other property therein described, in trust for the sole use and benefit of her and her children ; which deed, after an endorsement thereon by Turner, accepting the trust reposed in him, was, on the same day, acknowledged by Binns and admitted to record in the recorder's office of said county, and the property therein conveyed was delivered to her possession, and she continued to enjoy the undisturbed possession thereof until the 16th April, 1840, when, by force and against her consent, the same was taken from her.

That about the 25th September, 1837, Samuel Murray, the husband of complainant, removed to Monroe county, State of Missouri, bringing with him the complainant, her children and the trust property, which property remained in her possession until the 16th April, 1840, when one Samuel H. Pool, acting constable, with others, under color of legal process against Samuel Murray, her husband, took and carried away the slaves in the deed of trust mentioned, notwithstanding she remonstrated against it and informed them of her title to said slaves ; and on the 9th May, 1840, the said slaves were sold at public sale to satisfy certain judgments and executions in the constable's hands against her said husband in favor of the said Fox and other creditors, who she charges counselled and directed the seizure and sale of said slaves. At the sale,

she forbid the officer proceeding, and again made known her claim to the slaves. Since the sale, and before the bringing of the bill, she demanded of the purchasers and those holding possession, the slaves aforesaid, but they refused to restore the possession to her.

That the trustee in the deed, Robert B. Turner, at the date thereof, resided in Tennessee, and still continues to reside there, and is unable by reason thereof to protect the property or discharge any of the duties confided to him. That her children are all minors except William, the eldest; who has attained his majority since the sale of the slaves.

The bill makes an exhibit of the deed from Binns to Turner—makes all parties in interest defendants—asks the appointment of a guardian *ad litem* for the minor children—prays for a decree for the slaves, and compensation for their services since their seizure by the officer, and that the trustee be removed and one appointed residing in this State, to manage the trust property. The joint answer of the defendants, Fox, McMurtry, Williams, Shropshire, Wilson, Fruit, Hanna and Hill, admit the marriage as stated in the bill, and that the children by the marriage are correctly set forth ; that Samuel Murray, with the complainant and their family, with the property described in the exhibit to the bill, removed to this State about the time stated, and that the slaves named and described in the bill were executed and sold by the constable to satisfy certain judgments and executions in their favor against Samuel Murray ; that the sale was forbidden by the complainant or her agent, and a pretended claim set up to the property by her, and that since the sale and before the commencement of this suit, a demand was made by the complainant for said slaves and refused by defendants.

As to the deed from Binns to Turner conveying the slaves in trust for the benefit of the complainant and her children, the defendants have no personal knowledge, and demand proof of its execution, &c. But if the same was executed as it purports, they charge that it was done in fraud and is utterly void, for they alledge that Samuel Murray was largely indebted at the time he conveyed these slaves to his brother-in-law, Binns, and that the conveyance was only colorable and made to protect them from the just claim of his creditors, and with an understanding that Binns was to convey them in trust for the benefit of Samuel Murray's family.

That Binns, at the time of the conveyance from him to Turner, was greatly embarrassed, and not in a condition to make such a provision for the complainant and her children, even if the conveyance from Murray to him was made in good faith.

That the slaves and other property described in the deed from Binns

to Turner, were brought to this State by Samuel Murray, who exercised over them every act of ownership, claiming the slaves as his own, and disposing of the other property without any objection on the part of the complainant, and thus acquiring credit upon the faith of this property. The deed from Binns to Turner was not recorded in Monroe county, which, if done, would have imparted notice to the defendants; nor had they notice from any other source of the claim now set up by the complainant, until about the time they were pressing their claims against Samuel Murray.

That on the day prior to the levy by the constable on the slaves, Binns, who was then in this State, procured from Samuel Murray a deed of trust conveying all the property of said Murray, except the slaves and the property before that time conveyed to secure some bank endorsers, under the pretext that Murray was largely indebted to him. This deed is made an exhibit in their answer.

The defendant, Samuel Murray, answered, admitting all the material charges and allegations in the bill.

William A. Murray also answered, admitting the charges in the bill.

Binns failed to answer, and a decree *nisi* was taken against him.

Robert B. Turner admits in his answer the execution of the deed, and that he accepted the trust therein confided to him. That at the date thereof, all the parties resided in Davidson county, in the State of Tennessee. That he supposed at the time, and since has had no reason to doubt, but that the deed was made in good faith and for no other purpose than that expressed therein. Immediately after the execution of the deed, Samuel Murray and his family removed to Missouri, taking with them the trust property.

The guardian *ad litem* of the children answered, disclaiming all knowledge of the transaction, and invoking the protection of the chancellor.

General replications were filed to the answers, and the cause set for hearing.

Before giving a summary of the testimony adduced on the hearing, as set out in the bill of exceptions, we would remark, that the record is very voluminous, containing about two hundred pages, and embracing a great deal of immaterial impertinent stuff, foreign to the issue and shedding no light thereon. Bills of sale, mortgages, deeds of trust, judgments and depositions, were read upon the trial, to prove that William A. Binns, of Tennessee, the grantor of the slaves in controversy, and brother of the complainant, had been guilty of fraud generally in his pecuniary transactions; and that Samuel Murray, the husband, both before

36

and since the date of the deed of trust, made fraudulent transfers of his property. This may be true in fact, and is most fully established by the evidence adduced, but what legitimate influence can it have in the decision of the matter in controversy? The question now to be decided is, whether the deed from Binns to Turner passed the title of the slaves to the latter for the purposes of the trust; is the transaction such an one as the law will uphold and protect, regardless of the manifold frauds perpetrated before and since by Binns and Murray, unconnected with this transaction? Whether this conveyance be adjudged good or fraudulent, must depend upon its own attendant circumstances.

If the doctrine contended for by the defendants shall prevail, then a man generally fraudulent in his dealings can make no honest disposition of his property, and no one will be safe in dealing with him. But there is no greater propriety in such a rule than there would be in charging that an individual had committed a particular offence, because he had been guilty heretofore of similar offences. Therefore all the deeds, judgments and depositions introduced for the purpose of establishing fraud generally on the part of Binns and Murray, either prior or subsequent, unconnected with the transfer of the slaves in controversy, should have been excluded on the motion made by the complainant. We shall not notice them for the purpose of deciding this case.

The legal testimony in the case shows that Samuel Murray, and the complainant, his wife, who is sister of William A. Binns, were, in the year 1827, residing in the State of Virginia, in very moderate circumstances, when Binns assisted them to remove to the State of Tennessee, where they continued to reside up to the fall of 1837. During this time, Murray was somehow connected with Binns in wagoning and trading to Alabama, and purchased the negro man in question. Afterwards, in February, 1837, he purchased the negro woman mentioned in the bill at the price of $700. In the same year, Murray and Binns had a settlement of their transactions prior to the year 1836, upon which Murray was found largely indebted to Binns, and to discharge his indebtedness conveyed to Binns the negroes in suit, by an absolute bill of sale dated the 2nd September, 1837, which was duly acknowledged and registered on the 4th September, 1837. On the last named day, Binns conveyed the said negress, and some other property conveyed to him by Murray, to Robert B. Turner, in trust for the benefit of Mrs. Murray and her children, which deed was duly acknowledged and registered on the same day.

Shortly after the transfer from Binns to Turner, Murray had a public

sale of a portion of his effects, preparatory to his removal to this State. He brought the trust property with his family to Missouri, and on the route exercised the usual control of a master over the slaves; and in conversation, stated that his wagon had been stopped on the public square in Nashville, as he was removing to this State, and he was compelled to pay $500 for William A. Binns to obtain its release; that Binns was largely indebted to him. This was in presence of complainant, who remarked, "you know that my brother will pay you all that he owes you when he gets able." It does not appear that Samuel Murray left any debts unpaid in Tennessee, unless he was indebted to Binns. Samuel Murray reached Monroe county, Missouri, late in the fall of 1837, and shortly thereafter purchased a tract of land, with some improvements thereon, paying for it the sum of six or seven hundred dollars. Subsequently he entered an additional quantity of land adjoining. During the next year he commenced his old occupation of trafficking, and finally engaged in the pork business, to carry on which, he borrowed many small sums, of different individuals in the neighborhood, and contracted debts with the merchants and others. Thus he continued up to the fall of 1839, when his embarrassments had become so great as to disable him to meet his liabilities, and his creditors began to press him for their debts. In the spring of the year 1840, judgments were obtained against him, and the negroes in controversy were levied upon and sold by the officer to satisfy the same.

From the time Samuel Murray reached this State up to a short period prior to the levy of the executions on the slaves, he had continued to exercise the ordinary acts of ownership over the trust property, claiming it as his own, and disposing of a portion of it, without any complaint or objection on the part of his wife.

Three questions present themselves for our consideration:

1. Does the deed from Binns to Turner convey the slaves in controversy to the use of complainant and her children?

2. Has the complainant, since the conveyance to Turner, by her conduct, forfeited her interest in the trust property?

3. Does the removal of the trust property from the State of Tennessee to this State, and its possession with the husband, and his acts connected therewith, operate a forfeiture of the trust?

In this investigation, we assume as incontrovertible, the right of Samuel Murray to convey the slaves in question to Binns, for there is no evidence showing that Murray was indebted, at the time of making the conveyance, beyond his ability to pay, unless it was to Binns himself,

and hence he had the right to make the conveyance to Binns, if Binns saw proper to accept it, whether the conveyance was made to pay his indebtedness or otherwise, provided the conveyance was made in conformity with the requisitions of the statutes of Tennessee then in force. This conveyance appears so to have been made; and whatever may have been the secret purpose of Murray in doing the act, it is effectual in passing the title to Binns, as against Murray, and those claiming under him.

On the 4th September, 1837, William A. Binns, by his deed of that date, duly acknowledged and recorded as required by law, conveyed the slaves in controversy to Robert B. Turner, in trust for the benefit and use of the complainant and her children. There may be some question whether Binns was in a condition at this time to make such a deed, for he was then somewhat embarrassed, and shortly afterwards failed. The evidence on this point is not very clear, and if it was a subject of any moment in the decision of this case, we should be inclined to defer to the finding of the court below. But suppose Binns to have been greatly embarrassed at the time, yet, until his creditors came forward and asked to set aside the deed to Turner, as having been made in fraud of their rights, the conveyance remains in full force. What right have the subsequent creditors of Samuel Murray to complain, and charge that the conveyance is fraudulent, and should be so adjudged; for, if the conveyance be held fraudulent, they cannot reach the property in the hands of Binns, but the same would be subject to the claim of his creditors.

The next inquiry arises out of the conduct of the complainant in permitting her husband to exercise dominion over the trust property, to sell a portion of it, and claim the balance in his own right, without making known her title. This branch of the subject has been considered by the Supreme Court of the United States, in a case very similar to the present one, where the reason and justice of the views entertained by that court should commend them to the favorable consideration of all courts, where this question is involved.

In the case of the Bank of the United States vs. Lee, reported in 13 Peters' R., page 107–18, the Court says: "We are asked to deal with the conduct of a wife, living in harmony with her husband, as if she was a third person; and to decree against her because she did not expose her husband to the community in which they lived, and especially to the complainants, when within the wife's knowledge he was holding out her property as his own, and using of it as his own, and obtaining credit upon the faith that he was the true and absolute owner."

"That R. H. Lee did deal with and use the property in controversy, as if it had been his own, whilst he resided in this city; and that the community did believe him the true owner, and give him credit upon the faith of the property, is no doubt true; and it is very probable that Mrs. Lee knew the fact, but continued passive and silent on the subject."— "Was it a duty incumbent on Mrs. Lee to advertise the community in which she lived that her husband had no title to the property on the faith of which he was obtaining credit, but that it was hers'. This would have been charging the husband with fraudulent conduct; for it cannot be denied, that if A sells or conveys his slaves or lands, and then produces to another his previous paper title, and obtains credit upon the goods or lands by pledging them for money loaned, he is guilty of fraud; and if the true owner stands by and does not make his title known, he will be bound to make good the contract, on the principle that he who holds his peace when he ought to have spoken, shall not be heard now that he should be silent. He is deemed in equity a party to the fraud. How far the principle applies in the case of a wife of a fraudulent vendor standing by, we are not called on to decide, and wish to be understood as not deciding. Mrs. Lee's is not that case; to say the most, she was only passive and silent in regard to her rights generally, although she may have had knowledge that Mr. Lee was obtaining credit on the faith of her property; and the question is, was it her duty to have acted otherwise? All we need say is, that a court of chancery cannot hold Mrs. Lee responsible because of her silence."

"Then as to the question of possession continuing with the grantor.— Leave the relation of man and wife between R. H. L. and E. L. out of view, and it would be impossible that any one could have been misled by Mrs. L. having the possession—she having the sole and exclusive beneficial interest and right of possession. The difficulty arises from a circumstance, the existence of which the Statutes of Virginia contemplated and provided for. By the act of 1785, it is declared, that where any reservation or limitation shall be made of a use or property, by way of condition, reversion, remainder, or otherwise, in goods and chattels, the possession whereof shall remain in another, the same shall be taken, as to creditors and purchasers of the persons remaining in possession, to be fraudulent, within the first section of the act; and that the absolute property is with the possession, unless such reservation or limitation of a use or property is declared, by will or deed, proved, &c."

"The Statute of Virginia has been adopted in Tennessee, where it has been holden, that a deed like the present, founded on a good considera-

*Murray* vs. *Fox*, et al.

tion, and separating the title from the possession, was within the stat-
ute and must be recorded ; but when recorded, creditors and purchasers
of him who retain the possession must take notice of it, and that the re-
cording exempts the property from liability to execution.   Martin &
Yerger's R., 110.   The great object of the act was to secure the settle-
ment of slaves, by the intervention of executors and trustees, so as to
retain them in the family ; and this could be done by a *bona fide* gift of
a husband (not materially indebted at the time) to a wife or children, if
the deed was duly recorded, to the exclusion, not only of subsequent
creditors, but subsequent purchasers also, contrary to the 27th of Eliz-
abeth, whereby (in the language of the Supreme Court of Tennessee, 1
Yerger's R., 15) an extravagant, spendthrift husband may provide for his
wife and children before they are overtaken by ruin.   In Virginia, there-
fore, the possession of Mrs. L. was in accordance with the established
practice, and is in no degree subject to imputation."

The question raised in this case, whether the removal of the trust pro-
perty from Tennessee to Missouri and the failure to record the deed in
Missouri, does not operate a forfeiture under the trust deed, and subject
the property to the debts of Murray, is similar to the question raised in
the case of the Bank vs. Lee, before cited, and that court held that the
rights acquired under the deed were not in any wise affected by such re-
moval.   But if the point had not been adjudged heretofore, it is too plain
to admit of doubt.   If the deed from Binns to Turner was made in con-
formity to the requirements of the law of Tennessee, where it was exe-
cuted, then the title passed under the deed, and being perfect, a remo-
val of the property could not unsettle the title.

As the case of Crenshaw vs. Anthony, Martin & Yerger's R., 110, in-
volves some of the questions raised in the case now under consideration,
and was made by the Supreme Court of Tennessee, where this transac-
tion had its origin, we will extract so much of the statement given of that
case, in the opinion of the Supreme Court of the United States, as is ap-
plicable.   In 1812, Crenshaw sold certain slaves to Herring, who after-
wards contracted for the purchase of a tract of land from C., lying in
the same county in Virginia, but the wife of C. refused to relinquish her
dower, when H. agreed with her and her son, Cornelius, to convey to
Cornelius, in trust for his mother, two of the slaves previously purcha-
sed from C.   The deed was duly acknowledged and recorded where the
parties resided.   In 1814, C. and his wife removed to Tennessee, car-
rying the slaves with them,—Cornelius, the trustee, continuing to res-
ide in Virginia.

In Tennessee, to all appearance, C. was the true owner of the slaves, and acquired credit on the faith of the property. He was improvident. In 1821, Stacy recovered judgment against C. in the county of his residence in Tennessee, by virtue of an execution, founded on which, Anthony, the sheriff, seized upon the slaves, and Cornelius, the son, trustee for his mother, sued the sheriff in detinue. The circuit court held the deed of trust void by force of the Statute of Tennessee, because the deed had not been recorded in Tennessee; a verdict was rendered for the defendant, and the plaintiff prosecuted his writ of error to the Supreme Court, where the judgment was reversed. That court held that the deed made in Virginia, separating the title and the possession, was of a character to be operated upon by the act of 1785 of Virginia, and had the deed not been recorded there, as to creditors and purchasers, the title would have been deemed to be with the possession; but having been recorded there, a title fair and unimpeachable vested in the trustee and *cestui que trust,* Nancy; that being valid in Virginia, the statute of Tennessee could not affect it. Furthermore,

The court refused to hold the wife responsible because she had continued passive and silent in regard to her separate right to the slaves, by which individuals might have been, and in all probability were, induced to believe her husband the true owner, and to give him credit on the faith of the property. The wife had done no affirmative act designedly to draw in the creditors to trust her husband; and the court believed, by remaining silent, she had violated no duty, nor been guilty of any deceit on which a forfeiture of her right could be pronounced.

If it were possible, under the facts in this case, to hold Mrs. Murray culpable to an extent which would authorize the court to set aside the deed as to her, and vacate the trust, still her children have rights under the deed, and they have done no act meriting so severe a penalty. But Mrs. Murray has done no affirmative act to mislead the creditors of her husband; she remained passive; she did not expose him by making known her claim to the slaves. From necessity, the trust property was in the possession of Murray, and it was natural that he should exercise control over it. What is a married woman to do who has a separate estate settled upon her? If the harsh rule contended for shall prevail, she must either abandon her husband to enjoy the quiet and undisturbed use of the property, or endanger the harmony of the conjugal relation, by proclaiming to the community that her husband is not to be trusted because the property in possession belongs to her; and she must refuse to let him

exert any control over her separate estate.    Such doctrine cannot receive the sanction of any judicial tribunal in this land.

Wherefore, for the foregoing reasons, the decree of the Circuit Court ought to be reversed, and the cause remanded to that court, with directions to reinstate the bill and to enter a decree in conformity to the principles of this opinion.

Judge SCOTT concurring, the decree is reversed and the cause remanded.